664 So.2d 1354 (1995)
Patricia Templet CARPENTER, Individually, and as Administratrix of the Estate of Her Minor Son, Jim Travis Templet
v.
Eric JOHNSON, Gordon Stanley Johnson, Phyllis Griffin, Charles Valluzzo, D/B/A McDonald's, McD's Plank Road, Inc. and Employers National Insurance Corporation.
No. 95 CA 0431.
Court of Appeal of Louisiana, First Circuit.
December 15, 1995.
*1355 John A. Lieux, Gonzales, for Plaintiffs-Appellants.
Thomas E. Balhoff, Baton Rouge, for Defendant-Appellee, Charles Valluzzo, d/b/a McDonald's.
Neil C. Brown, Marrero, Pro Se.
Gordon S. Johnson, Gonzales, Pro Se.
Phyllis Griffin, Prairieville, Pro Se.
Eric W. Johnson, Gonzales, Pro Se.
Errol J. Kling, Jr., Baton Rouge, for Community Health Network.
Before SHORTESS, PARRO and KUHN, JJ.
SHORTESS, Judge.
On February 24, 1989, an altercation at the McDonald's restaurant in Gonzales between three minors, Jim T. Templet, Eric W. Johnson (Johnson), and Neil C. Brown, resulted in serious injuries to Templet. Templet's mother, Patricia Templet Carpenter, filed suit on Templet's behalf against Johnson; Johnson's father, Gordon S. Johnson (G. Johnson); Brown; Brown's mother, Phyllis Griffin; Charles L. Valluzzo d/b/a McDonald's,[1] owner of the premises on which the altercation occurred; and Employers National Insurance Company, the liability insurer of Valluzzo. Carpenter also asserted claims individually for her son's medical expenses and her own loss of consortium. Templet reached majority while the suit was pending and amended the suit to assert his own claim.
Valluzzo filed a cross-claim against Johnson, G. Johnson, and Griffin. Community Health Network of Louisiana, Inc. (Community), intervened to recover medical expenses paid on behalf of Templet.
The case was tried to a jury, which found Templet, Brown, and Johnson were at fault. The fault was apportioned 20% each to Templet and Brown and 60% to Johnson. The jury further found Valluzzo and his employees free from fault. Templet was awarded *1356 $75,000.00 in general and special damages, and Carpenter was awarded $25,000.00 for loss of consortium. The trial court entered judgment in accordance with the verdict and dismissed all claims against Valluzzo.[2]
Carpenter and Templet (plaintiffs) appeal.[3] They contend (1) the trial court erred in finding Valluzzo free from fault and (2) the damages awarded to Templet were inadequate. The portion of the judgment casting Brown and Johnson with fault was not appealed and is now final.

FACTS
On the day of the incident, Chris M. Fife left East Ascension High School (EAHS) and drove to McDonald's, as was his daily routine. He opened the hatchback of his car and began working on the speaker wires to his "boom box." Meanwhile, Templet, his cousin, left St. Amant High School (St. Amant), picked up Chad Long at his elementary school, and went to McDonald's. Templet and Long went inside to eat, where they were joined by Dustin M. Braud, a St. Amant student and friend of Templet's.
Upon leaving the restaurant, Templet and Braud saw Fife. Templet jokingly made some deprecatory remarks to Fife about the quality of his sound system. The remarks were overheard by Brown, a student at EAHS who knew Fife but not Templet or Braud. Brown, who described himself as having a "pretty bad temper" and who may have been "looking to pick a fight," decided to defend Fife. He began cursing Templet and challenged him to a fight. He shoved Templet, and they began to fight, first punching each other, then rolling on the ground. Johnson, a friend of Brown's from EAHS, was inside the restaurant when the fight began. He ran outside and intervened in the fight. Brown and Templet separated, and as they were walking in opposite directions, Johnson ran behind Templet and punched him in the head. Templet spun, fell, and hit the concrete hard, where he lay unconscious and bleeding from his left ear until an ambulance and the police arrived. Johnson was convicted of second degree battery and served fifteen months in prison for his attack on Templet.

WAS VALLUZZO FREE FROM FAULT?
Plaintiffs argue Valluzzo breached his duty to take reasonable care for the safety of his patrons. Plaintiffs further contend Valluzzo voluntarily assumed a duty to protect his patrons by adoption of internal company policies, then breached that duty by failing to comply with those policies.
The general duty of a business owner toward his patrons is to exercise reasonable care for the safety of persons on his premises and to not expose such persons to unreasonable risks of harm. Mundy v. Department of Health & Human Resources, 620 So.2d 811, 813 (La.1993). The duty does not extend to unforeseeable or unanticipated criminal acts by third persons. Mundy, 620 So.2d at 813; Harris v. Pizza Hut, 455 So.2d 1364, 1371 (La.1984).
Plaintiffs contend Valluzzo was aware large numbers of teenagers congregated at his place of business each day after school and argue Valluzzo should have hired security guards for crowd control. It is undisputed students from both EAHS and St. Amant gathered at the McDonald's in Gonzales after each school day. Randall C. Link, the store manager, testified most of the students ordered a drink or food, although he was aware a number of students came just to socialize. Valluzzo testified the decision of whether to let a crowd gather depended on the condition *1357 of the crowd, the size of the crowd, and what was happening. He stated that "ninety-eight (98) percent of these kids are good, clean, all-[A]merican type kids that understand, you know, rules and regularly come in and act like ladies and gentlemen."
Templet, Brown, Johnson, Fife, Long, and Braud testified they had never seen a fight there after school, although they had seen or heard of incidents on the weekend nights. Brown and Fife testified they felt McDonald's was a safe place. Link stated he had never seen a fight in the afternoon at this McDonald's. Valluzzo employed security guards on the weekends after 8:00 p.m. because an older crowd with access to alcohol gathered there at that time. He felt security guards were unnecessary in the afternoons, however, because he had never had a problem during that time period at any of the twenty McDonald's he owned in the Baton Rouge area.
The mere presence of a crowd of reasonably well-behaved teenagers does not impose a duty on a business owner to hire security guards. Plaintiffs did not show Valluzzo could have reasonably anticipated the altercation between Templet and Brown or the criminal assault on Templet by Johnson. Based on the evidence presented, we cannot say Valluzzo breached his duty of exercising reasonable care for Templet's safety.
Plaintiffs contend that even if Valluzzo did not breach his general duty toward Templet, he negligently breached a more extensive duty which he voluntarily assumed by adopting "no loitering" and "travel path" inspection policies. When a duty to protect others against criminal conduct has been voluntarily assumed, liability may be created by a negligent breach of that duty. Mundy, 620 So.2d at 813-814. The question we must answer is whether the policies adopted by Valluzzo were reasonably intended to protect against the harm sustained by Templet and, if so, whether a breach of those assumed duties led to Templet's injuries.
The McDonald's restaurant in Gonzales is a franchise. It follows the national policies of McDonald's Corporation as well as local, stricter policies. Link testified the corporate Operations and Training Manual sets forth the standards and practices of McDonald's, as a corporation. It provides the following no loitering policy:
The following behavior cannot be allowed: 1) car hoods up; 2) group gathering and standing around; 3) cars left unattended while the owners visit with friends in other cars; 4) squealing of wheels and hot rodding. If problems such as these develop and cannot be stopped, you may want to hire a security officer. When breaking up a situation, speak in a polite, firm, positive manner. Don't be antagonistic. Explain that you appreciate their business, but that you have certain policies at McDonald's which must be upheld.
The corporation also provides a booklet called the Pocket Quality Reference Guide, which refers to a travel path a manager is to follow every thirty minutes, inspecting the premises. The corporate Management Development Program states the travel path should take two to three minutes to complete. Link testified local policy is to walk the travel path every fifteen minutes, if possible.
Plaintiffs contend Valluzzo's employees violated the no loitering policy and failed to conduct the travel path inspection properly. They further contend that had these assumed duties not been breached, Templet would not have been injured.
Link testified regarding the no loitering policy. He stated he made a business decision to let the students socialize, but he tried not to let large crowds congregate. He normally allowed the students to socialize eight to fifteen minutes, after which he asked them to leave. He did not allow students to keep the hoods or hatchbacks on their vehicles raised "for a protracted length of time."
Braud and Fife testified they visited McDonald's after school on a regular basis but had never been asked to leave the parking lot. Brown stated the McDonald's employees *1358 would "run you off" the parking lot, although no one asked him to leave on the day of the altercation. Jack Kemp, the area supervisor for McDonald's, testified he arrived at the restaurant about 3:00 p.m. that day. He saw several students congregating in the parking lot, so he asked them to leave.
Regarding the travel path inspection, Link testified cleanliness is its primary purpose. One of the three managers on duty inspects the premises checking for safety hazards such as spills, and aesthetic and sanitary problems, such as litter and dirty rest rooms. Link stated he normally made a travel path inspection at 2:45 p.m. on school days to ensure the parking lot and lobby were clean before the onslaught of students. He made the inspection at 2:45 p.m. and again at 3:05 p.m. on the day of the incident. He stated if there had been a problem with rowdy students he would have asked them to leave, but they were not any rowdier than usual that day. He stated he would have noticed if there had been an unusually large crowd.
If there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State, 617 So.2d 880, 883 (La.1993). Here, the jury was presented with the testimony of Valluzzo's employees that they complied with the voluntarily assumed duty to prevent crowds from congregating in the parking lot. The jury apparently believed this testimony that the company's no loitering and travel path inspection policies had been followed. This was a permissible view, and we are thus precluded from finding manifest error. Because we find no manifest error in this factual finding, we need not determine whether these policies were intended to protect patrons such as Templet from the type harm he suffered.

WERE THE DAMAGES AWARDED TEMPLET INADEQUATE?
The trial court awarded Templet $30,000.00 for past medical expenses, $20,000.00 for loss of future wages or earning capacity, $25,000.00 for past, present, and future mental anguish, physical pain and suffering, and disability, and nothing for future medical expenses. Templet contends these damages are woefully inadequate and an abuse of the fact finder's vast discretion.
If compensable injuries, proven by a preponderance of the evidence and supported by the record, are not included in the judgment, the trier of fact has committed manifest error, and it is the function and duty of the appellate court to amend the judgment and include reasonable compensation for the omitted damages. Usé v. Usé, 94-0972, p. 14 (La.App. 1st Cir. 4/7/95), 654 So.2d 1355, 1363, writs denied, 95-1834, 95-1879 (La. 11/13/95), 662 So.2d 468; Alphonso v. Charity Hospital, 413 So.2d 982, 985-86 (La.App. 4th Cir.), writ denied, 415 So.2d 952 (La.1982).
Furthermore, a trier of fact errs when it fails to award the full amount of medical expenses proven by a victim. Usé, 94-0972, p. 12, 654 So.2d at 1363; Sumrall v. Sumrall, 612 So.2d 1010, 1014 (La.App. 2d Cir.1993).
If damages were awarded but the plaintiff contends they are inadequate, the correct standard for appellate review is clear abuse of discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). In reviewing a damage award, we must review the evidence in the light which most favorably supports the judgment and make an articulated analysis of the facts and circumstances peculiar to this particular case and plaintiff. If that analysis discloses an abuse of discretion, i.e., that the award is below that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances, we may raise the award only to the lowest amount reasonably within the trier of fact's discretion. Theriot, 625 So.2d at 1340-1343.
Much of the evidence regarding Templet's injuries is undisputed. Templet's documented *1359 medical expenses through the date of trial were $30,777.97, and the trial court erred in awarding him only $30,000.00. Furthermore, medical testimony established more likely than not plaintiff will require medication for mood swings and headaches for the rest of his life. Based on the current cost of the medication, Dr. Pat Culberson, plaintiffs' expert economist, testified the cost of future medication, discounted to present value, will be $85,630.00. This evidence was not contradicted. Thus, the trial court was manifestly erroneous in finding Templet would incur no future medical expenses.
The trial court awarded Templet $25,000.00 in general damages. Templet was hospitalized for twenty-four days following the assault. He sustained a fracture at the base of his skull, through his inner ear. He had a blood clot, bleeding, swelling, and bruising in his brain, and blood and fluid accumulated between his brain and his skull. A hole was drilled in his skull to allow the fluid to drain and relieve the pressure on his brain.
These injuries resulted in permanent total deafness in his left ear and damage to his olfactory nerves which deprived him of his sense of smell and much of his sense of taste. The hearing in his left ear has been replaced by a constant noise which he described as sounding like "a bunch of crickets on a clear night." He has chronic headaches which are somewhat relieved by medication.
Templet also suffered organic damage to the frontal lobe of his brain which resulted in a personality disorder. Although he appears normal, he has mood swings, difficulty planning ahead, and "disinhibition," or a lack of judgment in acting and speaking. He gets some relief from antidepressant medication.
Plaintiffs presented the testimony of Dr. Carlton S. Stanley, a psychologist, Dr. James M. Robertson, a neurologist, Lewis Lipinski, a vocational rehabilitation counselor, and Dr. John F. Bolter, a neuropsychologist, all of whom testified regarding the problems Templet has and will suffer as a result of the brain damage. Because over five years had passed between the injury and the trial and the problems remained, all of the experts opined they were permanent, and Stanley and Bolter thought the problems would probably worsen as Templet grows older.
The experts opined Templet will have difficulty in his personal relationships because he is now egocentric and his disinhibition causes him to act impulsively. His injuries will cause him difficulties in finishing college and keeping a job. Robertson testified Templet would be able to sustain employment, but "the job will not be as ... good a job as he might have otherwise...." Stanley opined Templet was disabled from working because of his brain injury. Bolter testified Templet should stay away from high stress jobs because pressure exacerbated his personality problems, and from jobs and hobbies where he might sustain another head injury. Dr. Jack Breaux, Templet's otolaryngologist, testified he should avoid loud noises that might damage his right ear.
Thus, Templet's employment choices are limited to low stress jobs without risk of head injury or loud noise which do not require a college degree or a great deal of concentration. Lipinski reported to Culberson that, based on these facts, Templet's income would be $10,000.00 per year less than a person without those limitations. Using Templet's work life expectancy, Culberson calculated he would lose $255,918.00 in future earnings.
It is clear from the testimony of these experts Templet sustained major injuries and a resulting significant loss of earning capacity. In light of these facts and figures, we find the trial court's award of $25,000.00 for general damages and $20,000.00 for loss of earning capacity and future loss of wages to be an abuse of discretion.
We must increase the award to Templet for past medical expenses to $30,777.97, and award proven future medical expenses of $85,630.00. We increase Templet's award for future loss of wages and loss of earning capacity, and general damages, including physical and mental pain and suffering, and disability, to $400,000.00, the lowest amount *1360 reasonably within the trier of fact's discretion. These sums must be reduced by 20%, the percentage of fault attributed to Templet by the fact finder, which was not appealed.

CONCLUSION
For the foregoing reasons, the portion of the judgment of the trial court dismissing Valluzzo is affirmed, and the judgment is amended to increase the damages awarded to James T. Templet from $60,000.00 (80% of $75,000.00) to $413,126.38 (80% of $516,407.97). Costs of this appeal are assessed equally to Eric Johnson, Gordon S. Johnson, Neil Brown, and Phyllis Griffin.
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] Plaintiff improperly named "McD's Plank Road, Inc." as a separate defendant.
[2] Judgment was rendered in solido against Brown and Griffin for 20% and in solido against Johnson and G. Johnson for 60% of Templet's and Carpenter's damages. The cross-claim was not mentioned in the judgment. Community's intervention was mentioned only insofar as its claims against Valluzzo were dismissed. Employers National Insurance Company was not cast in judgment.
[3] Valluzzo also appealed, but he voluntarily dismissed his appeal.